334 So.2d 523 (1976)
Elnora Tate PERRY, Individually and as Natural Tutrix of her minor children, Melvin Gerald Perry, Jr. and Morlan Perry, Plaintiff-Appellant,
v.
Randy J. LAW et al., Defendants-Appellees.
Jimmy PERRY, Jr., Plaintiff-Appellant,
v.
Randy J. LAW et al., Defendants-Appellees.
Nos. 10737, 10738.
Court of Appeal of Louisiana, First Circuit.
May 24, 1976.
Rehearings Denied June 30, 1976.
Writs Refused September 24, 1976.
*524 Paul H. Due, Baton Rouge, for Elnora Tate Perry in No. 10737 and Jimmy Perry, Jr., in No. 10738.
Iddo Pittman, Jr., Hammond, for Randy J. Law, Indiv. and State Farm Mut. Auto. Ins. Co.
Joseph H. Simpson, Amite, for Randy J. Law, Indiv.
Before SARTAIN, CHIASSON and EDWARDS, JJ.
SARTAIN, Judge.
These consolidated cases were occasioned by a head-on collision which occurred on U. S. Highway 51 at approximately 5:20 P.M. o'clock on April 19, 1973, in the Parish of Tangipahoa, north of Amite, Louisiana.
Jimmy Perry, Jr. (Perry), accompanied by his brother, Melvin G. Perry (decedent), was driving his 1968 Chevrolet automobile in a southerly direction. Randy J. Law (Law) was driving his parents' 1972 LTD Ford automobile in a northerly direction. Law was alone at the time. Both Law and Perry sustained serious bodily injuries. The decedent was killed instantly.
Elnora Tate Perry, individually and as natural tutrix of Melvin G. Perry, Jr. and Morlan Perry, minors, brought suit (10,737) against Randy J. Law and State Farm Mutual Automobile Insurance Company (State Farm), the liability insurer of his Ford vehicle, for the alleged wrongful death of her husband and the children's father. These named defendants filed a general denial, asserting that the accident was caused solely through the negligence of Jimmy Perry, Jr. and alternatively, a third party demand against Perry for onehalf of any judgment rendered against them in favor of the widow and minor children of the decedent.
In Jimmy Perry's suit (10,738) against them, State Farm and Law also entered a general denial, urged contributory negligence on the part of Perry, and State Farm reconvened for sums paid under the collision and medical payments provisions of its policy.
Following trial on the merits, the district judge, without reviewing or particularizing the facts, rendered judgment simply stating that plaintiffs had failed to prove "who caused the accident" and dismissed both suits. Plaintiffs in each suit have appealed and defendants have answered these appeals re-urging their respective third party and reconventional demands.
All parties hereto agree that the trial court erred as a matter of law when it failed to reconcile the conflicting testimony of the two drivers or, if this not be possible, then to consider probabilities or improbabilities in the light of other factors and the degree of proof required. This contention is particularly applicable in the suit for the alleged wrongful death of Melvin G. Perry, who was a guest passenger. His death occurred as a result of a headon collision which took place on a relatively straight, level, hard-surfaced highway, in the late afternoon, and under ideal driving conditions. It is evident that one or both of the drivers of the vehicles involved were negligent.
*525 In Nelson v. Zurich Insurance Company, 247 La. 438, 172 So.2d 70, 72 (1975), the court stated:
"From the foregoing, it is obvious that the opposed versions are irreconcilable, hence we must resort to the application of the well recognized rule that: `Where witnesses differ, the courts should reconcile, if possible, the apparent contradictions their testimony presents. If this cannot be done, then the probabilities or improbabilities of their respective statements must be considered in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required.' Fridge v. Talbert, 180 La. 937, 158 So. 209. See also, Cockrell v. Penrod Drilling Company, 214 La. 951, 39 So. 429; Fogelman v. Interurban Transp. Co., 192 La. 115, 187 So. 73. In the Fridge case, the court very aptly observed: `The testimony of a witness which is corroborated by admitted or established facts must prevail necessarily over that which is inconsistent with those facts.'"
It therefore becomes our task to resolve the factual and legal issues here presented. A remand is not in order. Gonzales v. Xerox Corporation, La., 320 So.2d 163 (1975).
The undisputed facts are: U. S. Highway 51 is a typical asphalt two-lane highway. It is twenty-four feet wide, with a twelve foot lane for each direction of travel. It runs in a north-south direction and is bordered by relatively wide shoulders. At the time of the accident the weather was clear, visibility was excellent, and the highway was dry.
Perry, accompanied by the decedent, was proceeding in a southerly direction driving his 1968 Chevrolet automobile at a speed of 40-50 m. p. h.
After the collision, the Perry vehicle came to rest facing west with its rear bumper extending to the east edge of the northbound lane and its front bumper extending to approximately the center of the southbound lane. The Law vehicle came to rest in a ditch paralleling the southbound lane. The right front of each vehicle came into contact with the right front of the other. The overlap was fifty to sixty percent of the width of each vehicle.
We now turn to the testimony. The only eyewitnesses to the accident are the drivers themselves.
Perry testified that as he was proceeding in a southerly direction he observed the Law vehicle approaching him at a high rate of speed. Just before this vehicle reached him he saw the driver's head fall to the left, like he had fallen to sleep. Simultaneously, this vehicle veered sharply into the southbound lane. At this point the decedent hollered "look out". Perry had already observed the action of the approaching vehicle when his brother spoke out. He explained that at that moment more than one-half of the Law vehicle was in the southbound lane. He (Perry) then cut sharply to his left in an attempt to avoid the collision. He stated that at the moment of impact, his own left front wheel had just crossed the center line.
Law testified that as he was proceeding in a northerly direction, he observed the approach of the Perry vehicle. He explained that when this vehicle was about one hundred to one hundred fifty yards from him he observed that it had crossed the center line of the highway. Law then removed his foot from the accelerator but when the Perry vehicle returned to its proper lane Law then resumed his normal speed. He stated that when the Perry vehicle was about fifteen yeards from him, it veered sharply back into the northbound lane whereupon he (Law) cut his steering wheel sharply to the left in an attempt to go around him and avoid the collision.
The first person to arrive at the scene of the accident was J. M. Lindsey. Mr. Lindsey *526 described the position of the vehicles as related above. He found that while the debris was scattered generally over most of the highway the greater portion of it was concentrated near the center line where the Perry vehicle was resting. He went first to the Perry vehicle and observed the driver who was still behind the steering wheel "kind of bent over". He saw the decedent lying in the back seat with his legs extended to the front seat. He did not approach the Law vehicle at that time because he thought that any occupant therein was dead. Other persons had then arrived so he left to summon help. When he returned very shortly, he saw that Law was trying to pull himself out of his vehicle. With the assistance of others, Law was removed from the car "hollering and screaming and saying, `what happened'". Law was conscious and gave Lindsey his father's name and telephone number. He also stated that Perry was conscious and declined his offer of help.
Lindsey is an agency manager for another insurance company. He had a camera in his vehicle and the photographs he took at that time are in the record. This witness looked particularly for skidmarks and found none. He did identify gouge marks in the asphalt surface near the western edge of the southbound lane, which he said were made by the Law vehicle.
Trooper Fred Lewis Piazza of the Louisiana State Police investigated the accident for that agency. This officer could find no skidmarks. He observed that the Perry vehicle had remained at or very near to the point of impact. The Law vehicle had traveled a distance of thirty-five feet after impact and had come to rest on its top in the ditch to the west of the highway. He concluded that both vehicles had crossed the center line and that the right front of each vehicle made contact at the "immediate center" of the highway. Law had already been removed from the scene. However, Perry was still there and told the officer that he was traveling 45 m. p.h. and was attempting to "dodge" the Law vehicle. He later talked to Perry at the hospital and because of the circumstances of the accident he caused a blood test to be performed to determine if Perry had been drinking. The test was negative.
He did not have an occasion to question Law.
Mr. Alvin Doyle, Jr., recognized as an expert in automobile accident investigation, testified on behalf of the plaintiffs. He commenced his investigation on August 22, 1973, some four months after the accident. On this date he went to the scene of the accident and took numerous photographs which he identified and are in the record. Also available to him were the police report and the pictures taken by Lindsey, Piazza and one Larry Dale. Dale's pictures were taken for State Farm on the day following the accident.
Doyle identified three significant marks on the road surface. The first such mark was a heavy oil spot located exactly on the center line. This mark is located at a point coinciding with the spot where the right front wheel of the Perry vehicle came to rest. The second mark was identified as an "explosion mark". It measured generally twelve inches by twelve inches. The third mark is a gouge in the asphalt surface itself. These three marks are located in almost a straight line running perpendicular to the center dividing line of the two lanes of travel.
Doyle stated that the oil mark on the center line probably came from the transmission of the Perry vehicle inasmuch as its consistency was heavier than the type of oil found in the crank case.
It was his opinion that the explosion mark was a series of pot marks on the highway surface which were created when the two vehicles were forced down by the energy released on impact. The center of this explosion mark measured five feet west of the center line and seven feet east *527 of the west edge of the southbound traffic lane.
Doyle opined that the gouge mark was caused by the Law vehicle as it pivoted to the northwest after impact and before it left the hard surfaced area of the highway. This mark measured six feet in length. It was located thirty-three inches from the western edge of the asphalt on its southern end and ten inches from the edge of the asphalt on its northern end.
The right front suspension system of the Perry vehicle was forced back seventeen inches from its normal position. The steering wheel was locked at a 90 (or 1/9th) turn to the left. It was his opinion that the steering wheel was turned to this position before contact because the initial impact would so damage the steering mechanism as to prevent manual turning after impact.
He also pointed out on the photographs taken at the scene of the accident what he identified as a "tire swerve mark". In his opinion this swerve mark was made by the Perry vehicle as it attempted to avoid the Law automobile.
Based on these facts, Doyle concluded that the center of impact or the point of collision was at the explosion mark, that is, five feet west of the center line or in the southbound (Perry's) lane.
Professor A. J. McPhate, an expert in the field of design, dynamics and structure, also appeared on behalf of the plaintiffs. His expert opinion, based on the position of the vehicles following collision, the dynamics involved, and the photographs offered in evidence, was that at the moment of impact Perry's right front wheel was five feet west of the center line. He agreed with Mr. Doyle in that when an accident occurs such as the one involved in the instant litigation, it is not unusual for there to be evidence of damage to the roadway similar to the "explosion mark" testified to by Doyle.
Dr. Olan K. Dart, Jr., an expert in automobile accident analysis and reconstruction, testified on behalf of the defendants. He visited the scene of the accident on May 30, 1974, some thirteen months following its occurrence. He agreed generally with the measurements taken by Doyle. On his visit to the scene he observed the oil mark on the center line and the gouge mark near the western edge of the asphalt surface. The explosion mark was not detected by him. He placed the point of collision on the center line. He explained that with a fifty to sixty percent overlap, the vehicles traveling at the speeds indicated, and a right front to right front collision, that on impact the two vehicles pivoted on their respective right front wheels. The Perry vehicle moved very little after impact. The Law vehicle, while continuing its pivoting motion, proceeded a distance of about thirty-five feet from the point of collision. He attributed the greater movement on the part of the Law vehicle to its heavier weight.
While Dr. Dart conceded that the accident could have happened the way Mr. Doyle explained, he was of the opinion that had the point of collision been further to the west than the center line (or where Doyle placed it), the Law vehicle could not have made the gouge marks where it did.
Regardless of whether one accepts the testimony of plaintiffs' experts and place the point of collision at the explosion mark (five feet west of the center line) or the testimony of defendants' expert and place the point of collision on the center line, the unalterable fact remains that at the moment of impact portions of both vehicles were across the center line. This is the crucial factor and one which accords with all the testimony, lay and expert.
Inasmuch as each vehicle was across the center line, each driver maintains very strongly that the other created an emergency by crossing the line and each driver was endeavoring to avoid a collision by *528 cutting to the left and attempting to pass in the opposite lane.
Counsel for each driver, therefore, argues that his driver's version should be accepted because the testimony of the other driver has been successfully discredited. Law had previously been cited for and pled guilty to several traffic offenses for speeding and improper lane usage. He acknowledged these offenses after some prodding on cross examination. The credibility of Perry's testimony is challenged because of previous criminal offenses resulting in his confinement at Angola on two occasions. We do not find that the credibility of either of these drivers has been diminished to the point where either one's testimony should be accepted over the other.
Considering all of the testimony above, we find that both drivers were negligent in failing to keep their respective vehicles in its proper lane and that it was this concurrent negligence that was the cause in fact of the accident. Stated another way, and applying the rule announced in Nelson v. Zurich Insurance Company, above, we find and so hold that it is more probable that this unfortunate accident happened as a result of the inattention of both drivers than it was caused solely in the manner stated by either one of the drivers to the absolute exclusion of the other driver's version.
Accordingly, Jimmy Perry's suit and State Farm's reconventional demand therein will be dismissed. In the other suit, the surviving widow and minor children will have judgment against Law and State Farm with these defendants obtaining judgment on their third party demands against Perry for one-half of the amount thereof.
We now turn to the matter of State Farm's exposure in the premises. This issue arises as a result of the fact that State Farm had issued two policies, one covering the 1972 Ford LTD automobile owned by Randy Law's parents and another policy covering the 1969 Chevrolet pick-up truck, which was owned by and titled to Randy J. Law.
It is beyond question that Randy Law had the express permission of his parents to use the 1972 LTD Ford. His use of this vehicle was made necessary because his 1969 Chevrolet pick-up truck was temporarily inoperable.
Notwithstanding the fact that the 1969 Chevrolet pick-up truck was owned by Randy Law, the policy of insurance covering this vehicle showed Jeff Law, Randy's father, as the named insured.
The record reflects that the Law family had for some years prior to the accident purchased all of its insurance through Mr. Sid Johnson, Bogalusa, Louisiana, agent for State Farm. Mr. Jeff Law testified that when he called Mr. Johnson to secure coverage for this automobile he informed the agent that the vehicle was owned by his son, Randy. Mr. Johnson stated that he did not recall Mr. Jeff Law telling him that the vehicle was owned by his son. Had he been so informed he would nonetheless have issued the policy though there would have been an adjustment in the rate. Based on these circumstances, plaintiffs contend that both policies are applicable, namely: that the policy on the Ford automobile affords primary coverage and that the policy on the Chevrolet pick-up truck affords excess coverage. Both of these policies provided for bodily injury coverage to the limit of $10,000.00 for each person. Hence, plaintiffs argue that $20,000.00 of liability insurance coverage is at stake whereas State Farm submits that only $10,000.00 is at issue because both of the aforementioned policies listed Jeff Law as the named insured and since Randy Law was a member of Jeff Law's household, the "non-owned" provision of the policy covering the Chevrolet pick-up is applicable and excludes excess coverage. Graves v. Traders and General Insurance Co., 200 So.2d 67 (1st La.App., 1967); Ehrhard v. *529 State Farm Mutual Automobile Insurance Co., 274 So.2d 911 (1st La.App.1973).
Plaintiffs further contend that the policy issued covering the 1969 Chevrolet pick-up truck, showing Jeff Law as the named insured, should be reformed to conform to the intent of the parties by designating Randy Law as the named insured. Collins v. State Farm Automobile Insurance Co., 188 So.2d 460 (3rd La.App., 1966); Herbert (Hebert) v. Breaux, 285 So.2d 829 (1st La.App., 1973); and, Anderson v. Sciambra, 310 So.2d 128 (4th La.App., 1975).
Both of these lines of authorities do in fact stand for the propositions for which they are cited. The question for resolution is whether we are dealing with (1) two vehicles, (2) two separately owned automobiles, and (3) two different named insureds. We find that each of these elements is present in the instant case. Randy Law was the owner of a 1969 Chevrolet pick-up truck and his parents were the owners of the 1972 Ford. This truck was purchased and paid for by him. He also reimbursed his father for the cost of the policy issued by State Farm covering the said truck.
The record fully supports that the policy obtained on the 1969 Chevrolet pick-up truck was intended to afford protection to Randy Law and that the policy should and the same is hereby reformed to accord with this intention. For these reasons, State Farm's exposure in the instant case is $20,000.00, i. e., $10,000.00 of primary coverage and $10,000.00 of excess coverage.
We now turn to the question of quantum for damages suffered by the surviving widow and minor children of Melvin G. Perry. Each has prayed for damages for loss of love and affection, grief and mental anguish and loss of support. In addition, the surviving widow seeks recovery for funeral expenses in the amount of $1,044.75.
At the time of his death decedent was thirty-one years of age, had been married to his widow for eight years, and his children were five and three years of age, respectively.
The record reflects that he was a good father and husband and that this was a closely knit family unit. Under these circumstances we feel that the surviving widow should receive the sum of ONE HUNDRED TEN THOUSAND AND 00/100 ($110,000.00) DOLLARS for general damages and the amount of ONE THOUSAND FORTY-FOUR AND 75/100 ($1,044.75) DOLLARS for funeral expenses. Each of the minor children should receive, as general damages, the sum of FORTY THOUSAND AND 00/100 ($40,000.00) DOLLARS.
Accordingly, for the above reasons, in Suit No. 10737, the judgment of the trial court is reversed and judgment is rendered herein on the main demand in favor of Elnora Tate Perry, individually, in the amount of ONE HUNDRED ELEVEN THOUSAND FORTY-FOUR AND 75/100 ($111,044.75) DOLLARS, and as the natural tutrix of her minor children, Melvin G. Perry, Jr. and Morlan Perry, in the amount of FORTY THOUSAND AND 00/100 ($40,000.00) DOLLARS for each child, and against State Farm Mutual Automobile Insurance Company and Randy J. Law, in solido, in the amount of TWENTY THOUSAND AND 00/100 ($20,000.00) DOLLARS, and against Randy J. Law, individually, in the amount of ONE HUNDRED SEVENTY-ONE THOUSAND FORTY-FOUR AND 75/100 ($171,044.75) DOLLARS, together with legal interest on the above amounts from date of judicial demand, until paid, and for two-thirds (2/3) of all costs of these consolidated suits.
Judgment is further rendered (in Suit No. 10737) herein on the third party demand in favor of State Farm Mutual Automobile Insurance Company in the amount *530 of TEN THOUSAND AND 00/100 ($10,000.00) DOLLARS and Randy J. Law in the amount of EIGHTY-FIVE THOUSAND FIVE HUNDRED TWENTYTWO AND 37/100 ($85,522.37) DOLLARS, and against Jimmy Perry, Jr., together with legal interest theron from date of judicial demand, until paid.
In Suit No. 10738, the judgment of the trial court dismissing plaintiff's suit is affirmed and plaintiff therein is cast for one-third (1/3) of the costs in these consolidated suits.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.